**THE CLANCY LAW FIRM, P.C.**
Donna H. Clancy, Esq. (ID No. 041531990)
40 Wall Street, 61st Floor
New York, New York 10005
(212) 747-1744
dhc@dhclancylaw.com
*Attorneys for Plaintiff*

.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| WILLIAM NELSON,<br><br>                          Plaintiff,<br><br>   v.<br><br>INDEGENE, INC.,<br><br>                          Defendant. | Civil Action<br><br>**COMPLAINT<br>AND JURY DEMAND** |

.

Plaintiff WILLIAM NELSON, by way of Complaint against Defendant Indegene, Inc., alleges and says:

## INTRODUCTION

1.  This is an action brought by Plaintiff William Nelson ("Plaintiff" or "Nelson") against Defendant Indegene, Inc., ("Defendant," "Indegene," or the "Company") under 28 U.S.C. 1658 (a), the Sarbanes Oxley Act of 2002 ("SOX"), as a result of retaliation taken against him, including wrongful discharge for engaging in protected activities by complaining about Indegene knowingly and willfully misrepresenting, concealing, falsifying and/or fraudulently reporting financial records, through mail and/or wire fraud including, but not limited to, electronic communications, video meetings, telephone, e-mail and/or texts, with the intent and for the purpose of inflating the Company's Initial Public Offering ("IPO") valuation.

1

2. Based upon his education, years of experience and training, Nelson reasonably believed that Indegene's conduct was fraudulent, constituted wire and/or mail fraud, fraud against shareholders and/or otherwise violated the law, and, therefore, objected verbally and in writing to persons with supervisory authority over him and to such persons working for Indegene who had authority to investigate, discover and/or terminate the misconduct.

3. Nelson's whistleblowing came on the heels of Indegene's initial public offering (IPO) announcement, at which point, he discovered that the Company had fraudulently reported the revenue of a Client it had contracted with (Cingulate, Inc.) which had inflated revenue and assets associated with it along with approximately 100 other claims wherein those clients had their revenue misrepresented. Indegene is in the process of filing and completing an IPO and thus is incentivized to falsely report revenue to drive up the valuation of its IPO.

4. In April 2023, Plaintiff reported his concerns about the financial irregularities and Indegene's misrepresentation of revenue – actions Plaintiff believed were intentional and aimed at inflating the Company's valuation ahead of its planned IPO. As a result of Nelson's objections and whistleblowing, including, but not limited to, his refusal to assist or participate in the violations, Indegene retaliated against Nelson by wrongfully terminating his employment just two weeks after engaging in protected whistleblowing activity in violation of SOX, on or about April 14, 2023.

5. The retaliation taken against Plaintiff has caused him significant economic losses, including, loss of salary, bonus, benefits, lost opportunity and damage to reputation.

**JURISDICTION AND VENUE**

6. This is an action brought under SOX and, therefore, this Court has jurisdiction under 28 U.S.C. 1331. This Court also has diversity jurisdiction under 28 U.S.C. 1332 as Plaintiff resides in Illinois, Defendant is headquartered in and has a principal place of business located at 150 College Road W #104, Princeton, New Jersey 08540, and Plaintiff has damages well in excess of $75,000. Venue is

proper under 28 U.S.C. 1391(b)(2) as a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## IDENTIFICATION OF THE PARTIES

7. Plaintiff, who currently resides in Illinois, is an employee covered under SOX.

8. Plaintiff was employed by Indegene as Senior Director of Business Development, Omnichannel Marketing from April 18, 2022 until his wrongful termination on April 14, 2023.

9. Indegene is in the business of providing an integrated end-to-end commercialization solution to healthcare organizations and pharmaceutical enterprises including agile operations, co-commercialization and consulting in clinical, regulatory, safety, medical affairs, analytics, pricing, reimbursement & market access, marketing and customer experience.[1]

10. Indegene was founded in 1998 and is based in Bangalore, India, with US offices in Princeton, New Jersey. It also has offices in India, the European Union and Asia-Pacific. Indegene is an entity covered under SOX pursuant to SEC's Bilateral Memorandum of Understanding with the Securities and Exchange Board of India (SEBI) executed in 1998, and because its IPO proposes a class of securities requiring registration under Section 12 of the Securities Exchange Act of 1934 ("SEA") and/or is required to file reports under Section 15(d) of the SEA.

## FACTS COMMON TO ALL COUNTS

11. Plaintiff, William Nelson, was employed by Indegene as a Senior Director, Omnichannel Marketing – Business Development, from April 18, 2022 until the Company illegally terminated him in retaliation for engaging in protected whistleblowing activities on April 14, 2023.

12. Plaintiff, who has an MBA in Business Administration – Financial Strategy & General Management from the University of Chicago Booth School of Business, with two decades of extensive experience in financial portfolio growth, acquisitions and integrations, was amply qualified for his role

---

[1] https://www.sec.gov/Archives/edgar/data/1862150/000149315223007252/ex10-19.htm

as a Senior Director of Business Development at Indegene, having received numerous accolades from his superiors throughout the course of his employment. It is based on this experience that Plaintiff was able to identify Indegene's fraudulent misrepresentation of its revenue and financial records, which Plaintiff reasonably believed to have been committed willfully and knowingly by Indegene for the purpose of fraudulently inflating the Company's valuation for its planned IPO.

13. As a Senior Director, Plaintiff reported directly to Howard Genderson, Vice President ("VP"), Biotech Strategy & Business Development and Unit P&L Owner.

14. VP Genderson reported directly to Indegene's Senior VP ("SVP") and Unit Owner, Tim Moore. Moore and Genderson have been close friends since college.

15. SVP Moore reported directly to Indegene's Senior Leadership Owner Gaurav Kappor.

16. Indegene Owner, Gaurav Kappor reported directly to the CEO of Indegene, Manish Gupta.

17. On March 16, 2023, VP Genderson emailed various employees, including Plaintiff, who are also investors through the Company's Restricted Stock Units ("RSU"s,) announcing that, "Emerging Biotech has closed [Indegene's] first DevCom deal with Cingulate."

18. Cingulate, Inc. is clinical-stage biopharmaceutical company registered publicly traded on the NASDAQ as "CING." It focuses on the treatment of Attention Deficit/Hyperactivity Disorder (ADHD) and anxiety.

19. In his March 16, 2023 email, VP Genderson advised that, "[o]ver the next several years, [Indegene] will focus on supporting Cingulate as they take their ADHD drug, CTx-1301, to the market."

20. VP Genderson further stated in his March 16, 2023 email: **"This deal has a total value of $110M dollars over 5 years. We are currently finalizing the first SOW for $2.5M to begin work in April." "SOW" is a term that means "Statement of Work" that in this case would delineate the**

**work or services Indegene would perform for Cingulate under the contract to earn the $110 million in revenue over the five year period beginning in 2023.**

21. VP Genderson's March 16, 2023 email also provided a link to the Company's LinkedIn post and press release announcing the Indegene-Cingulate Deal.[2] Cingulate also reported the Deal in two of its SEC filing, including its S-1 SEC filing, which describes the Deal in detail.[3]

22. Indegene's press release of its deal with Cingulate published on its website[4], "Indegene Model Geared for Efficient National Commercial Launch in Multibillion-Dollar ADHD Market," states, *inter alia*:

> "'This agreement provides a clear path to commercialize CTx-1301, upon FDA approval, designed specifically to tackle the unmet needs of this $20 billion market by providing the first true, entire-active-day treatment for ADHD. But the clinical success of a potential treatment can only be realized with commercial excellence, making this partnership between Cingulate and Indegene a critical step for our Company,' said Shane J Schaffer, Chairman and CEO, Cingulate."[5]

23. The press release further states, "The [Indegene-Cingulate] partnership is focused on driving revenue and is designed to ensure predictable cash outflow and continues through three years post-launch of CTx-1301."[6]

24. The press release also includes a quote from Indegene's SVP Moore wherein he states, "We [Indegene] have worked with 19 of the top 20 global pharmaceutical companies, and this joint commercialization agreement expands Indegene's services to an emerging growth company, positioning Cingulate for success in the event CTx-1301 is approved by the FDA."[7]

---

[2] https://www.linkedin.com/posts/indegene_cingulate-and-indegene-announce-joint-commercialization-activity-7041003554777534464-qZo2/?utm_source=share&utm_medium=member_desktop
[3] https://www.sec.gov/Archives/edgar/data/1862150/000149315223007265/forms-1.htm
[4] https://www.indegene.com/news/cingulate-and-indegene-announce-joint-commercialization-agreement-for-Lead-adhd-candidate-ctx-1301
[5] *Id.*
[6] *Id.*
[7] *Id.*

25. The press release also includes "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended:

> "This press release contains "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. These forward-looking statements include all statements, other than statements of historical fact, regarding our current views and assumptions with respect to future events regarding our business, including statements with respect to our plans, assumptions, expectations, beliefs and objectives with respect to product development, clinical studies, clinical and regulatory timelines, market opportunity, competitive position, business strategies, potential growth opportunities and other statements that are predictive in nature.
>
> These statements are generally identified by the use of such words as "may," "could," "should," "would," "believe," "anticipate," "forecast," "estimate," "expect," "intend," "plan," "continue," "outlook," "will," "potential" and similar statements of a future or forward-looking nature. Readers are cautioned that any forward-looking information provided by us or on our behalf is not a guarantee of future performance. Actual results may differ materially from those contained in these forward-looking statements as a result of various factors **disclosed in our filings with the Securities and Exchange Commission (SEC), including the "Risk Factors" section of our Annual Report on Form 10-K filed with the SEC on March 28, 2022.** All forward-looking statements speak only as of the date on which they are made, and we undertake no duty to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except to the extent required by law."[8] (emphasis added).

26. At this time, in or around March 2023, Indegene reported just under $300 million in annual recurring revenue. Accordingly, VP Genderson's March 16, 2023 email, denoting $110 million in Cingulate revenues over a five year period, constitutes a material change for Indegene during the IPO quiet period as required by the SEC.

27. However, Cingulate's business cannot support these figures, as represented by VP Genderson, as Cingulate has only $7.5 million in current assets and cash available as of March 2023. Accordingly, Plaintiff reasonably believed that Cingulate could not possibly pay Indegene the $2.5 million in the first year, as represented by VP Genderson in his March 16, 2023 email, while satisfying its other obligations.

---

[8] *Id.*

28. Cingulate has no revenue, no FDA products to sell, a weak balance sheet, and is in danger of being delisted according to its most recent 8-K. Thus, Cingulate is not in position to complete any actual revenue deals that Indegene could reasonably rely on as stated in its Press Release and in particular, its anticipated revenue of $110 million to be earned under its contract with Circulate.

29. Simply stated, Cingulate would have to generate an estimated $1 billion in annual revenues selling ADHD drugs to support VP Genderson's statements in his email since SG&A Expenses are capped at 35% of sales maximum as an industry standard. This, in addition to the FDA and DOJ's limits on ADHD drugs which provides for a nationwide cap on production, means that it was a near impossibility and at minimum, highly improbable for Cingulate to reach such revenue in 2023 or by 2026 even if they got FDA approval.

30. When Plaintiff discovered this near impossibility or improbability, it became clear to him that Indegene was attempting to create booked revenue for the Company that was non-existent, as Indegene needed to report significantly more revenue after the Emerging Biotech Business associated unit lost approximately 40% of its customer base and related revenues in early 2023 due non-renewal of contracts arising from operational and customer success campaign issues.

31. Cingulate's S-1 SEC filing confirms that it had not signed a Statement of Work (SOW) with Indegene, meaning that Cingulate had no expressed financial commitment to Indegene. Nor does the Joint Commercialization Agreement executed by Indegene and Cingulate contain any dollar amounts.

32. The Cingulate Deal was a high visibility transaction which had no revenue and would likely never have revenue anytime in the near future. Rather, it was a ruse concocted by both companies for their mutual benefit.

33. Plaintiff, along with all other Indegene employees at the Director and VP level who were eligible to receive RSUs and thus stockholders were misled about the value of the deal along with the

valuation of the Company as a whole. This fraudulent statement on behalf of Indegene adversely impacts the stock of all investors, including employees with RSUs, such as Plaintiff, by affecting the value of Indegene's leading up to the IPO and beyond.

34. Indegene was aware of Cingulate's finances since at least February 2020. On February 20, 2020, Indegene hosted a "Fireside Chat,"[9] moderated by Jamie Peck, Indegene VP – Business Development, with speakers including Cingulate's CEO, Shane Schaffer, Nancy Phelan[10], CEO, Adhera Therapeutics, Mark Simon, Partner and Co-Founder, Torreya, Dave Lennon, President, AveXis, Inc., Sanjeev Agarwal, Chairman, Althera Pharma, and Anil Namboodiripad, President, Promius Pharma. Indegene VP Peck was required to perform due diligence for each companies present, which would have revealed Cingulate's minimal revenue and prospects. Given the high visibility and budget for the Fireside Chat program, Indegene's leadership team and C-suite, also had to sign off on these participants and attendees, all of whom are members of Indegene's Board of Directors, along with Brighton Capital and Carlyle Group, Indegene's two largest investors.

35. Notably, Carlyle Group and Brighton Capital, who would have had to have performed due diligence on the Deal, sold off all of their Indegene positions immediately after the deal was announced ahead of the IPO. This fire sale of their positions less than one year prior to the IPO is not typical considering that private equity investments are usually held for five to seven years; not 12-18 months. Plaintiff reasonably believes that Carlyle Group and Brighton Capital, who held two seats on Indegene's Board of Directors, sold off their positions because they also discovered that the revenue was overstated.

---

[9] https://urldefense.proofpoint.com/v2/url?u=https-3A__youtu.be_R-5FEoqMkNTEA&d=DwIFaQ&c=euGZstcaTDllvimEN8b7jXrwqOf-v5A_CdpgnVfiiMM&r=_21ErFxDoUOtdtuISRintdSRJeRCQ1pELNZ8dTJ44nk&m=_pMlx2aFqJaUhFMSNVu4BUL7hPR_looFFCo35OQAvCTVG1eaq7e1MD9oAOPOlJGJ&s=gGbFGXgUkZPwy7ClJ3oLUOAX1GXnDXB0nEtRqTfwjNk&e=

[10] Ms. Phelan is currently a Senior Vice President at Indegene.

## PLAINTIFF ENGAGED IN PROTECTED WHISTLEBLOWING ACTIVITIES

36. In two video calls in March 2023 and April 2023, Plaintiff engaged in protected activity by reporting to VP Genderson and SVP Moore that Indegene's exclusivity deal with Cingulate for its ADHD drug CTx-1301 comprised an effort to fraudulently book revenue for Indegene's upcoming IPO.

37. During the April 2023 video call, Plaintiff told VP Genderson, **"This Cingulate contract has no revenue."** Plaintiff further stated, "Why are you giving them [Cingulate] exclusivity when I have other active dialogues with prospective ADHD clients? It doesn't make any sense." VP Genderson replied, "Let's talk about it with Tim [SVP Moore]." Plaintiff retorted, **"This is sketchy. [We're ] lying about revenue!"**

38. Thereafter, in April 2023, Plaintiff had a call with VP Genderson and his direct supervisor, SVP Moore. Genderson and Moore have been close friends since college. Plaintiff reiterated his concerns about Indegene's fraudulent misrepresentation of Cingulate's revenue and Indegene's Exclusivity Agreement with Cingulate in light of Plaintiff being in the final stages of closing two ADHD clients with real revenue, financials and products already in the market. SVP Moore responded to Plaintiff that, "Exclusivity did not mean exclusivity," and that Indegene "could get out of [the Exclusivity Agreement] if [Plaintiff] closed another client deal."

39. SVP Moore and VP Genderson were aware that if Plaintiff closed the other ADHD deals, it would jeopardize Indegene's fraudulent scheme designed to support false revenue assumptions. Plaintiff brought this to their attention and was terminated within two weeks later.

40. Notably, Indegene's revenue reporting of its client-companies is conducted by a contractor, Carol Creighton, who Indegene hired with no finance and/or accounting experience, no FINRA, no MBA, no CPA, and no CFA licenses.

## PLAINTIFF IS TERMINATED IN RETALIATION FOR WHISTLEBLOWING

41. Less than three weeks after engaging in protected activity by reporting what Plaintiff reasonably believed to be illegal/fraudulent conduct by Indegene, on April 14, 2023, Carmela Kreisler, Indegene Human Resources ("HR"), informed Plaintiff, with VP Genderson present, that Indegene was terminating his employment under the guise of a reduction in force.

42. Plaintiff was terminated just days before his annual cut off where he would have become eligible for his bonus and RSU's.

43. On April 14, 2024, Plaintiff received written confirmation of his termination citing "Position Elimination," as the reason for his termination. However, Indegene's wrongful termination of Plaintiff in retaliation for his whistleblowing was pretextual, as his position, VP of Business Development was not eliminated. In fact, Indegene had hired a Vice President of Business Development (Plaintiff's same role), Norma Goodwin, in February 2023, who also reports to VP Genderson and performs 90% of the same job duties as Plaintiff. This role was essential to drive revenue for Indegene.

44. In fact, shortly after Plaintiff's termination, he was contacted by a third-party headhunter to fill a Medical Tech consultancy role. The third-party headhunter disclosed to Plaintiff that the target client company was Indegene. Plaintiff asked to have his name and resume removed from Indegene's employment application process. This role had a $180K salary and Indegene continued to hire other individuals to date in similar sales roles. As of March 5, 2024, Indegene had nine (9) vacant full-time positions listed on LinkedIn alone offering salaries of at least $150K each, equaling a $1.35M budget for head count, further evidencing Plaintiff's termination as a reduction in force was pretextual.

45. Further, shortly before Plaintiff's whistleblowing, in early February 2023, SVP Moore specifically advised Plaintiff during a 1:1 that, despite the lack of revenues and lost customers, Indegene would be retaining Plaintiff because, in SVP Moore's words, "it takes 2 years to be successful as a Business Development person." Contrary to SVP Moore's assurances to Plaintiff, he was terminated just

two months later, shortly after raising his concerns about Indegene's illegal conduct, further evidencing that the purported job elimination was a mere pretext to hide retaliation against Plaintiff as a whistleblower of Indegene's fraudulent revenue announcements.

46. On June 5, 2023, Indegene sent Plaintiff a Separation Agreement to waive his whistleblower claims against the Company.

47. Plaintiff hired an attorney who sent Indegene a demand letter on Plaintiff's behalf on June 14, 2023, briefly summarizing Indegene's fraudulent misrepresentation of revenue and Plaintiff's retaliatory discharge for his whistleblowing of the same.

48. Prior to Plaintiff's attorney advising Indegene of Plaintiff's claims of fraud and retaliation against the Company, Indegene had posted over 25 press releases relating to the Cingulate deal. However, the Company abruptly ceased posting any press releases on its deal with Cingulate immediately after receiving notice of Plaintiff's claims.[11]

49. Plaintiff's retaining of counsel resulted in Indegene taking further retaliatory action against him including unwarranted written allegations of confidentiality breach notifications sent from Indegene's attorneys to Plaintiff's attorney on September 28, 2023.

50. Based on these facts, Indegene's termination of Plaintiff's employment constitutes retaliation in violation of SOX, entitling Plaintiff to lost back pay, front pay, uncapped emotional distress damages, reputational damage, punitive damages, enhanced attorneys' fees, and costs of suit.

## COUNT ONE

51. Nelson repeats and realleges all of the previous allegations as if same were fully set forth herein at length.

---

[11] https://www.google.com/search?client=safari&sca_esv=87ccfbe49ac67335&hl=en-us&q=cingulate+indegene%C2%A0&tbm=nws&source=lnms&sa=X&ved=2ahUKEwiqy9v2j5iEAxV7jokEHShYCVgQ0pQJegQIDBAB&biw=1128&bih=769&dpr=2.

52. At all relevant times, Nelson was an employee and Indegene is an employer covered by SOX.

53. Indegene knowingly and willfully concealed and/or falsified information during Video meetings, electronic communications, press releases and in its electronic reporting through IndegeneNet, e-mails and/or other wire transmissions and/or through the use of the United States mail, for the purpose of obstructing or influencing an investigation and about which Plaintiff complained, to supervisory authority over him and/or such persons working for the Indegene who had authority to investigate, discover and/or terminate this alleged misconduct.

54. Indegene's wrongful conduct was taken to limit regulatory examination, avoid confirmation of its continuing inflated revenue, financial reporting, insufficient systems and business controls, and to conceal this risk from its shareholders.

55. Based upon Nelson's years of experience, education and training, he reasonably believed that Indegene was engaging in said wrongful conduct and, therefore, blew the whistle on its violations.

56. Nelson engaged in protected activities under SOX and was retaliated against by Defendant because of such protected activities.

57. As a direct and proximate result of said retaliatory and discriminatory conduct by the Indegene, Nelson has suffered, and continues to suffer compensatory and other economic damages, attorneys' fees and costs of suit.

58. The aforesaid conduct of Defendant was willful, wanton, malicious and/or in reckless disregard of Plaintiff's rights.

## COUNT TWO

### *PIERCE DOCTRINE*

59. Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

60. The New Jersey Supreme Court has held that "an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy. The sources of public policy include legislation; administrative rules, regulations or decisions; and judicial decisions." Pierce v. Ortho Pharm. Corp., 84 N.J. 58, 72, 417 A.2d 505, 512 (1980).

61. Plaintiff was subjected to adverse employment action in violation of the far-reaching public policy prohibiting retaliation against employees who engage in protected activity by complaining about reasonably suspected violations of SEC Rules, securities laws and other applicable promulgated rules providing for investor protections.

62. Specifically, Plaintiff alleges that Defendant retaliated against him following his objecting to the Defendant's misrepresentation of its projected annual revenue under a customer contract in connection with its IPO announcement.

63. As a direct and proximate result of Defendant's actions, Plaintiff has suffered damages, and losses, including, but not limited to monetary losses, income, benefits, and other privileges of employment.

64. Defendant's conduct is outrageous and malicious, was intended to injure Plaintiff and was carried out with reckless indifference to Plaintiff's protected civil rights, thereby entitling him to punitive damages.

## COUNT THREE

## RETALIATION IN VIOLATION OF NEW JERSEY CONSCIENTIOUS EMPLOYEE PROTECTION ACT ("CEPA") N.J.S.A. 34:19-1 et seq. 104.

65. Plaintiff repeats each and every allegation set forth above as if set forth fully herein at length.

66. At relevant times described herein, Plaintiff complained of Defendant's unlawful behavior and actions Plaintiff reasonably believed were contrary to public policy.

67. Defendant had knowledge of Plaintiff's complaints and/or protests.

68. As a direct result of Plaintiff raising complaints, Defendant took retaliatory action against

69. Plaintiff by terminating him under pretextual circumstances shortly after his complaints against Defendants' business practices and protected activity and failed and refused to pay him compensation , and within days of receiving other benefits including restricted stock units ("RSUs") that would have vested upon his one year anniversary in April 2023.

70. Defendant is vicariously, strictly, and/or directly liable to Plaintiff for its actions in violation of CEPA, pursuant to N.J.S.A. 34:19-1, et seq.

71. As a proximate result of the aforementioned acts and omissions set herein, Plaintiff has sustained significant damages.

72. Defendant's conduct is outrageous and malicious, was intended to injure Plaintiff and was carried out with reckless indifference to Plaintiff's protected civil rights, thereby entitling him to punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff William Nelson requests the following relief:

1. Compensatory damages for economic losses, emotional distress, mental anguish, humiliation, and loss of reputation and opportunity, reimbursement for lost commissions, bonuses, health benefits, stock benefits, social security, experience, career opportunities, and other benefits; in an amount to be proved at trial;

2. Liquidated damages in an amount to be awarded at trial;

3. Punitive damages in an amount to be awarded at trial;

4. Attorneys' fees, costs and disbursements;

5. Interest; and

6. Such additional relief to Plaintiff as the Court deems just and proper.

Dated: New York, New York
     April 12, 2024                          THE CLANCY LAW FIRM, P.C.

By: */s/ Donna H. Clancy*
Donna H. Clancy, Esq.
40 Wall Street, 61st Floor
New York, New York 10005
(t) (212) 747-1744
Attorneys for Plaintiff
*William Nelson*

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury of all issues triable of right to a jury.

Dated: New York, New York
      April 12, 2024  THE CLANCY LAW FIRM, P.C.

By: */s/ Donna H. Clancy*
Donna H. Clancy, Esq.
40 Wall Street, 61st Floor
New York, New York 10005
(t) (212) 747-1744
Attorneys for Plaintiff
*William Nelson*

## DESIGNATION OF TRIAL COUNSEL

**PLEASE TAKE NOTICE** that pursuant to Rule 4:25-4, attorney DONNA H. CLANCY, is hereby designated as trial counsel for PLAINTIFF WILLIAM NELSON in this matter.

Dated: New York, New York
      April 12, 2024                            THE CLANCY LAW FIRM, P.C.

                                                       By: */s/ Donna H. Clancy*
                                                        Donna H. Clancy, Esq.
                                                        40 Wall Street, 61st Floor
                                                        New York, New York 10005
                                                        (t) (212) 747-1744
                                                        Attorneys for Plaintiff
                                                        *William Nelson*

# CERTIFICATION OF NO OTHER ACTIONS

Pursuant to Rule 4:5-1(b)(2), it is hereby stated that the matter in controversy is not the subject of any other action pending in any other court or of a pending arbitration proceeding to the best of our knowledge or belief. Also, to the best of our belief, no other action or arbitration proceeding is contemplated. Further, other than the parties set forth in this pleading, we know of no other parties that should be joined in the above action. In addition, we recognize the continuing obligation of each party to file and serve on all parties and the court an amended certification if there is a change in the facts stated in this original certification.

Dated: New York, New York
     April 12, 2024                     THE CLANCY LAW FIRM, P.C.

                                          By: */s/ Donna H. Clancy*
                                          Donna H. Clancy, Esq.
                                          40 Wall Street, 61st Floor
                                          New York, New York 10005
                                          (t) (212) 747-1744
                                          Attorneys for Plaintiff
                                          *William Nelson*